By some oversight the two cases which follow were omitted from the volumes to which they properly appertain. Inquiry having been made for them, they are now inserted. The rulings in the first of these cases are important and novel.—REPORTERS.

| 24 | 705 |
| 29 | 46 |
| 24 | 705 |
| 33 | 319 |
| 24 | 705 |
| 35 | 460 |

## NED ANDERSON v. THE STATE.

### Tyler Term, 1886.

1. PRACTICE—PERJURY.—Under the rule of the common law, and under the statutory law of many of the States of the Federal Union, a false statement under oath, made in the progress of a judicial proceeding, can not be assigned as perjury, unless the tribunal sitting in judgment upon the proceeding not only had jurisdiction of the matter, but when its jurisdiction had actually attached. But, under the Constitution and the statutory laws of this State, the rule is more comprehensive, and a false statement may be assigned for perjury if it was made in the course of a judicial proceeding before a court of competent jurisdiction over the subject matter of the proceeding, although its jurisdiction had not actually attached. See the opinions, both on the original hearing and on the motion for rehearing, for an elaborate discussion of the principles underlying the rule.

2. SAME—CASE STATED.—The perjury assigned in this case was the alleged false testimony given by the accused upon the trial, in a justice's court, of one Green Wright, upon a charge of carrying a pistol. The prosecution against Wright was based upon a complaint and information, the former of which is required by law to be verified by the oath of some credible person. Evidence was introduced upon this trial which tended strongly to show that the complaint under which the prosecution of Wright was had was not sworn to; and upon the theory that, if the complaint was not sworn to, the jurisdiction of the justice of the peace had not attached in the Wright case, a false statement by accused in that proceeding was not assignable as perjury, the accused asked the trial court to charge the jury that, if they had a reasonable doubt that the complaint was sworn to, they should acquit. *Held* that, under the rule first announced, the trial court did not err in refusing the special charge.

3. SAME—FACT CASE.—A conviction for perjury, to be legally obtained, must be had upon the testimony of at least two credible witnesses, or that of one credible witness strongly corroborated by other evidence. See the statement of the case for evidence which, though conflicting, is *held* sufficient to support the conviction for perjury.

APPEAL from the District Court of Henderson. Tried below before the Hon. F. A. Williams.

The conviction in this case was for perjury, and the penalty assessed against the appellant was a term of five years in the penitentiary.

G. N. Adams was the first witness for the State. He testified that he held the office of justice of the peace of precinct number one, of Henderson county, Texas, on the thirtieth day of November, 1882, on which day the case of the State of Texas v. Green Wright, for carrying a pistol, was tried before him. That prosecution was upon complaint and information, and was instituted before T. P. Seay, the witness's predecessor in office, but was not disposed of by him, and was one of the first cases tried before witness upon his accession to the office of justice of the peace. Ned Anderson, this defendant, appeared and testified before the witness on that trial as a witness for the State. He testified substantially as follows: "On the night of October 28, 1882, there was a festival at the old Masonic hall, given by the colored people, where about one hundred and fifty colored people congregated. This was about three or four hundred yards from the court house in Athens. I was present, and Green Wright was also there. I saw him there. Some time early in the night a difficulty arose between one Sharp Ellick and Ike Manion. This was in the house. They were finally separated in the house. Green Wright and Ike Manion went out of the house, and soon afterwards the difficulty was resumed on the outside, about ten or fifteen steps north from the house. This last difficulty lasted but a few moments, but during the time it lasted a pistol was fired from some point outside of the house. Immediately after this difficulty, Green Wright came to where I was standing on the hall gallery near the steps—Wright coming from the north—and ran his hands into the pocket of a pair of saddle bags he had with him, and pulled out a pistol, which he showed the witness and returned to his saddle bags, with the remark: 'You see how easily I could have hurt those boys if I had wanted to.' Wright then had his saddle bags over his shoulder. We were standing

near the gallery or portico leading up to the door of the hall, and at the west or front of the same." Anderson, this defendant, testified before the witness that the only time and place he saw Wright on that night was on the portico when he showed him the pistol. The witness, who was then unfamiliar with the duties of his office, administered the oath to the defendant, reading it from the statutes. The hall or portico of the Masonic hall, testified about by defendant, was between six and eight feet wide. The steps mentioned by defendant in his testimony in the Wright case mounted the portico.

On his cross examination the witness said that he was not at the festival at the Masonic hall on the night of October 28, 1882, and knew nothing of his own knowledge of what occurred there on that night. At this point a complaint, signed by Spencer Hill and attested by T. P. Seay, justice of the peace for precinct number one of Henderson county, charging Green Wright with unlawfully carrying a pistol on October 28, 1882, and filed on that day by T. P. Seay, justice as aforesaid, was exhibited to the witness, and, respecting it, the witness testified as follows: "I recognize this as being the complaint on which Green Wright was placed on trial on November 3, 1882, and to the best of my knowledge it is the same. It has been in my custody all the time since then. I can't say for certain, nor will I be positive, that the signature to the jurat of that complaint is the genuine signature of T. P. Seay. In some respects it resembles my handwriting, but in others it does not. I must say that if Esquire Seay signed it he must have been drunk at the time, a habit to which he was then very much addicted. It does not look like Esquire Seay's signature. I did not sign it myself, nor have I any recollection of 'Squire Seay asking me to sign it for him. I do not remember that the county attorney ever asked me to amend the complaint by signing Seay's name to it. The complaint is now just like it was when I received it from my predecessor. The body of the complaint was written, according to my recollection, by Mr. Gossett, then the county attorney."

M. E. Richardson and John S. Jones, the attorneys for Green Wright on his said trial, were next introduced by the State, and testified substantially as did Justice of the Peace Adams, as to the testimony of the defendant on the trial of Wright. Jones testified, in addition, that this defendant was the only witness introduced and examined by the State in the prosecution of Wright. On that trial witness asked defendant what kind of a

pistol it was that he saw in the hands of Wright. Defendant replied that he was unable to tell whether it was a single shooter or a five shooter; that he only saw the handle, hammer and barrel. Witness then asked him if he saw the cylinder. He hesitated a moment, and then asked if witness meant the "round thing that balls were in?" The witness told him that that was what he meant, and defendant replied that he saw it. Witness then asked: "And still you say that you can't tell whether it was a single or five shooter?" Instantly the defendant replied: "Oh, yes; it was a five shooter."

Mr. Richardson, on cross examination after scrutinizing the complaint, testified that he did not know who wrote the signature to the jurat. It did not look like the handwriting of Esquire Seay, but it did somewhat resemble the handwriting of Esquire Adams. He recognized the signature to the file mark on the complaint as that of Esquire Seay. Witness was familiar with the handwriting of Esquire Seay. In his opinion, the signature attached to the jurat of the complaint was not the signature of Esquire Seay. Mr. Jones, on his cross examination, said that at the trial of Wright he observed the defect in the complaint, and intended then, in the event of failing to secure an acquittal, to take advantage of the same on motion in arrest of judgment. He testified, as did Richardson, with regard to the Seay signature to the jurat and file mark.

M. H. Gossett testified, for the State, that he was acting as county attorney of Henderson county in October, 1882, and conducted the prosecution of Green Wright on the trial referred to by the previous witnesses. He testified, as did the witnesses Adams, Richardson and Jones as to the testimony of defendant on that trial. Witness did not know who wrote Seay's signature to the complaint. It did not appear to be written in Seay's handwriting. It somewhat resembled the handwriting of Adams. Witness wrote the complaint, but had no recollection of swearing anybody to it. He could not now say whether or not Seay was present when he wrote the complaint. On his cross examination, the witness said that he was not at the festival at the Masonic hall, and could not testify to anything that occurred there. Several complaints were filed against different parties on account of what transpired on that night, and witness recognized his official signature to the several complaints now shown him. He had no recollection of suggesting to Justice Adams to amend the complaint by signing Seay's name. Seay's signature to the

file mark was genuine, but witness did not think that Seay's signature to the jurat was written by him.

Green Wright was the next witness introduced by the State. He testified that he was the person tried before Esquire Adams for carrying a pistol, upon the complaint in evidence. He testified also that the defendant, on that trial, was placed upon the stand by the State and testified substantially as detailed by the previous witness for the State. He testified further that, at the conclusion of the first row, which occurred inside of the house, he, witness, passed out of the house, and stepped to a point about fifteen or twenty steps north of the house, when the difficulty was renewed outside. It was quelled in a very short time, but while it was in progress, a pistol was fired from a point between where the witness was then standing and the house. Ben Young, Willis Houston and Ike Manion were standing near the witness at the time. Immediately after the pistol was discharged, Jim Simmons approached the witness in a threatening manner, and asked him if he was taking up the difficulty, and if witness wanted to fight. The witness at once turned from him, remarking, " I will not fight you, but I will fight you with the law." The witness then went direct to his horse, which was hitched at a point about twenty yards north of the hall, mounted, and went to town at once, to get officers. The town was north from the hall between three and four hundred yards. Witness followed the main road to a point about half way to town, when he took a left hand road, and entered the square on the west side, whence he rode to Titsworth's saloon, on the north side, where he saw a number of men standing, and asked those men where he could find the officers. They replied that the officers were some where about the jail. Witness went to the jail at once, but found no officers. He then went back to the hall, taking the route through the east side of the square. He met Joe Manion at a point about half way between town and the hall, and the said Manion gave witness his saddle bags. Witness rode his gray horse in either a gallop or a fast trot. When he reached the hall he got down from his horse and hitched him, and started to the crowd, already joined by the officers. Some body in the crowd exclaimed: "Green Wright is the man who has got the pistol." The officers then searched witness, going through his pockets and saddle bags, but found no pistol. Witness had nothing in his saddle bags but an empty bottle. He had no pistol on or about his person on that night at the festival, nor

did he have his saddle bags at the hall until he returned from town, as stated. When the witness left town that night to go to the festival, he left his saddle bags in town with Joe Manion, who proposed that he would get some whisky and put in them if witness would go home with him on that night. Witness did not see his saddle bags after he gave them to Joe Manion until on his return to the hall, after the rows, he met Manion on the road, as stated. The pistol was fired during the last row, from a point ten or fifteen steps south of and behind the witness, and witness had no idea who fired it. Witness did not see a pistol at the festival nor about the hall that night, but heard the report when it was fired. The witness did not go back to nor towards the hall after he left it at the conclusion of the first row. He had no conversation whatever with the defendant at any time that night.

Cross examined, the witness said that Joe Manion was his brother-in-law. Ike Manion, Joe Manion's son, and Sharp Ellick got into a row near the barber shop before the festival commenced, and the row was twice renewed after the parties got to the festival. The witness, when searched by the officers, had got his saddle bags from Joe Manion. The officers arrested witness and several other parties that night, and took them to the sheriff's office, when Mr. Gossett fixed up the papers to enable the several parties to give bond. The witness had no recollection of seeing Mr. Seay on that night.

Joe Manion testified, for the State, that he was in Athens on the night of the colored people's festival at the old Masonic hall. He met Green Wright in town and asked him to go out home with him on that night, and help him pick cotton. Wright agreed to go if witness would get some whisky. Witness agreed to do so, and Wright gave him his saddle bags, which contained the empty bottles. Witness took the saddle bags, and Wright went off towards the hall. Witness then "knocked about town" for a while, meeting Ben Anderson, for whom he got some bacon from Mr. Lammons. He then went to lawyer Manion's office, sat down and talked with Mr. Manion for some time. Witness and Mr. Manion then left the office, and went down the street towards the old Masonic hall, in which the festival was being held. They stopped on the south side of the square, where they talked for a few minutes. While at that point, the witness heard the report of a pistol, and some body hallooed. Witness thought he recognized in the halloo the voice of his son, and he

separated from Captain Manion, and went towards the hall. During all this time witness had Wright's saddle bags, but had not yet procured the whisky. To reach the hall from the point on the square where the witness was when he heard the report of the pistol, the witness had to travel about one hundred yards east, to strike the main road. About the time that witness struck the main road, he heard the rumbling of a wagon in town, and the bark of a dog which he recognized at once as the bark of his dog, which he had left with his wagon. Witness then turned and went back to town, without going to the festival. When he reached a point a short distance from where he started back, the witness met Green Wright, riding rapidly; and Wright told him that he had been to town to get the officers. Witness then gave Wright the saddle bags. There was no pistol in the saddle bags at any time while they were in the hands of the witness. Witness was not at the festival and knew nothing about anybody having a pistol there on that night. Witness had no recollection of seeing Mr. Seay on that night.

Trav. Anderson testified, for the State, that he attended the festival on the night of the difficulties. He did not see the row in the house, but saw a number of people when they came out of the house just before the second fuss, which occurred outside. Green Wright came out of the hall among the first, and passed the defendant at a very short distance. He had gone perhaps ten steps when Simmons passed witness. In passing witness, Simmons dropped a pistol, which he said was his, on witness's foot. Green Wright did not have a pair of saddle bags when he passed the witness.

On his cross examination the witness said that, at the last term of the court, he told the counsel for the defendant that it was Wright's pistol that fell on his feet, but he corrected that statement before he was placed on the stand by telling them that he was mistaken in that statement, and that it was Simmons's pistol. Witness remembered that he told Attorney Bishop at the September term, 1884, of the district court that it was Wright's pistol that fell on his feet, but at the very next term he told Mr. Bishop that he was mistaken in that statement, because Simmons told him that it was his pistol, and that he went back next day and got it.

Ben Young testified, for the State, that he was with Green Wright, about twenty steps north of the hall, when the pistol was discharged on the night of the festival. It was fired by

some person unknown to witness, at a point about ten feet south of the point where witness and Wright were then standing. Wright had no saddle bags with him at that time. The pistol was not fired by Wright. Wright left at once, saying that he was going to town to get the officers to stop the fight. He went toward town, and not toward the hall. He got back from town a few moments after the officers arrived, and then had his saddle bags. He and others were then searched by the officers, but no pistol was found. This witness also detailed the occurrences at the hall as they were detailed by Wright. Witness had no recollection of seeing Justice Seay on that night.

Willis Houston testified, for the State, substantially as did the witness Young, and, in addition, that he was a stranger to every body at the festival except Wright, and, consequently, he stayed with Wright throughout the night, and knew that Wright had no saddlebags before nor at the time of either of the difficulties. Just after Wright left, declaring that he was going to get the officers, one Jim Simmons struck the witness a severe blow with a pistol. Witness then ran up the road about a hundred yards, where he met the officers. The officers went on to the hall, and witness followed. Wright overtook witness and the officers about the time they got to the hall. On his cross examination the witness said that he started to run towards town after he was struck over the head with the pistol. He met the officers, and, a short distance further on, he met Wright. If Wright then had any saddle bags, witness did not see them.

Deputy Sheriff Reirson testified, for the State, that a few minutes before the pistol fired at the old hall on the night of the negro festival, as testified by previous witnesses, he passed Captain Manion's office, and saw Captain Manion and Joe Manion in conversation. Joe Manion then had a pair of saddle bags on his arm. Soon afterwards witness heard the shot fired at the hall. He went at once to the court house to get other deputies to go with him to the hall. While at the court house he saw somebody whom he did not recognize ride across the west side of the square on a gray horse. Witness, the sheriff and Tom Dean then went to the hall. About the time they reached the crowd Wright rode up on a gray horse, hitched it and walked towards the crowd. Defendant cried, loudly: "Green Wright has got the pistol." Others said the same thing. Green Wright's person and his saddlebags were searched, but no pistol was found. The saddlebags contained nothing but two empty bot-

tles. Witness had no recollection of seeing Esquire Seay that night. Sheriff Davis corroborated Reirson as to what occurred at the hall.

W. G. Titsworth testified, for the State, that a few minutes after the shot was fired at the old Masonic hall on the night of the festival, Green Wright, riding a gray horse, passed the witness's saloon, and asked for the officers. He then rode on towards the jail.

The State rested.

The defense first introduced in evi·³ ·nce the complaint signed by Spencer Hill, and ostensibly attes ᴜ by T. P. Seay, justice of the peace, which charged Green Wright with unlawfully carrying a pistol on October 28, 1882.

F. J. Richardson testified, for the defense, that he attended the festival at the old Masonic hall, on the night of October 28, 1882. The witness, this defendant and Ike Simmons were designated as marshals of the occasion, their duties being to preserve order. Just before the first difficulty, which occurred in the house, the witness observed the defendant and Green Wright in consultation, and, having occasion to change some money, he approached them. As he did so he saw Wright take a pistol from his saddle bags, which he had on his shoulder, and show it to defendant.

Cross examined, the witness said it was a distance of twelve or fifteen feet from the gallery to the place in the southwest corner of the room where defendant and Wright were talking when the latter showed his pistol to defendant. An intervening wall would prevent a person standing at the outer edge of the gallery from seeing defendant and Wright at the point in the southwest corner of the room. Witness did not know what character of pistol it was that Wright showed to defendant.

Jim Simmons testified, for the defense, that, a short time before the first difficulty in the house, he saw the defendant and Wright about half way down the house, on the south side, talking angrily to each other. Wright took a pistol from his saddle bags and showed it to defendant.

On his cross examination, this witness testified that, notwithstanding he had been convicted and fined for having a pistol on that night, and had paid his fine, he did not in fact have one, and he never at any time told Trav. Anderson that he had one. He did not strike Willis Houston over the head with a pistol on that night.

Spencer Hill testified, for the defense, that he attended the

festival, and saw the firing of the pistol mentioned by previous witnesses. The witness took Green Wright to be the man who fired that pistol, and accordingly, when the making of affidavits charging the bearing of arms commenced, he made the affidavit against Wright. Mr. Gossett wrote the affidavit. "Witness had no recollection of seeing Esquire Seay on that night. Witness had a pistol himself on that night. On being arraigned next day therefor, he pleaded guilty and paid his fine.

Beauregard Anderson testified, for the defense, that he attended the festival, and, about thirty minutes before the first row, he saw defendant and Wright talking, upon apparently friendly terms, in the southwest corner of the house. Wright showed defendant a pistol, which he took from a pair of saddle bags which he had with him. After the arrest of the several parties, the witness was sent to Esquire Seay's house to summon him to the jail. Seay sent word that he was sick, and did not go.

Cross examined, this witness denied that he ever told Mr. Algie Bass that he did not see Wright or anybody else have a pistol at the festival. He denied that on the former trial of this case he testified that he saw Wright show a pistol to defendant at a point just outside of the door, and near the steps of the gallery.

Johnson Winfield testified, for the defense, that just as the crowd started out of the house, after the first row, he saw Wright with a pair of saddle bags in one hand, and something in the other which he took to be a pistol. To the best of the witness's knowledge and belief, Wright fired a pistol on that night a few steps from the house.

Mary Allen testified, for the defense, that she saw Green Wright when he first got to the festival. Witness and Paulina Allen were running a table at that festival. When Wright approached their table, Paulina laughingly asked him if he had brought his saddle bags (which he had on his shoulders) in order to buy out the festival. Witness saw no one else at the festival with saddle bags.

Paulina Allen testified as did Mary Allen.

Ben Anderson, the father of the defendant, testified, in his behalf, that he met Joe Manion in town on the night of the festival, and was with him for some time, during which time said Manion bought him some bacon. Witness did not recollect seeing any saddle bags in the possession of Joe Manion on that night.

The defense closed.

Algie Bass testified, for the State, in rebuttal, that some time subsequent to the festival he asked Beauregard Anderson, in the presence of Trav. Anderson, if he saw Green Wright have a pistol on the night of the festival. Beauregard replied that he did not see Wright nor any one else have a pistol on that night.

A. B. Watkins testified, for the State, in rebuttal, that on the previous trial of this cause Beauregard Anderson testified that he saw Green Wright at the negro festival, and that he, Wright, had a pistol on that occasion, and that when he saw Wright with the pistol he was standing just outside of the house, near the steps.

Captain George D. Manion testified, for the State, that he raised Joe Manion from a boy, and was always visited by Joe when he came to town. Joe was in town on the night of the negro festival, and came to witness's office. After a long talk, witness and Joe walked across the square and stopped. They soon heard a pistol shot and a voice near the old masonic hall. Joe remarked: "That is my son Ike's voice. If he has got into trouble I want you to help him out." Witness could not now remember where he and Joe parted, nor could he now say that Joe did or did not have a pair of saddle bags with him.

The motion for new trial raised the questions discussed in the opinion.

*J. B. Bishop,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. One Green Wright was tried before a justice of the peace for carrying a pistol on or about his person. The trial was had upon a complaint, and upon the hearing appellant was a witness, and, being charged with giving false testimony, was indicted and convicted of perjury.

There is evidence in the record strongly tending to prove that the complaint was not sworn to. This being the case, it is insisted that the court should have instructed the jury that, if they had a reasonable doubt as to whether the complaint was sworn to, they should acquit the defendant. Concede the fact that the complaint was not sworn to, does it follow that defendant could not commit perjury upon the trial under such complaint? There is no question as to the jurisdiction of the justice to hear and de-

termine the cause then before the court. The court had juris-
diction of the offense, the subject matter of litigation. But ap-
pellant insists that the jurisdiction had never attached in that
case, and hence there was no authority in the justice to swear
the defendant, and, therefore, no perjury.

Upon this subject Mr. Bishop says: "Thus we are led to the
further proposition that not only must the tribunal have juris-
diction of the cause, as before explained, but the cause must be
properly in court." (1 Bish. Crim. Law, sec. 1028.) To the same
effect are all the authorities accessible to us at this place, for we
have examined very carefully all of them. We have found two
English cases bearing upon this question, one of which is di-
rectly in point. In Regina v. Millard, Dean's C. C., 166, an
information, not under oath, was laid before a justice against a
prisoner for unlawfully damaging a carriage, and the prisoner
was indicted for perjury committed on the hearing of that infor-
mation. It was objected that the information ought to have been
made under oath, but it was held that, as the law did not require
the information to be sworn to, therefore the justice had juris-
diction. It seems very clear that the converse would have been
held if the law had required the information to be on oath.

But we have a case precisely in point in Regina v. Scatton, 5
Queen's Bench, 493. The act of Parliament rendered it necessary
that an information should be verified on oath of a credible wit-
ness before any proceeding be taken for summoning the party
accused or compelling his appearance. The information not
being thus verified, it was held that the justice had no jurisdic-
tion, and consequently a person giving false evidence on such
an occasion is not guilty of perjury. We deem it unnecessary
to cite further authority in support of Mr. Bishop's proposition,
namely, that the court must not only have jurisdiction of the
cause of action, but that the jurisdiction must have attached in
the particular case.

From these authorities it would seem to follow that the posi-
tion of appellant is correct. We have no doubt of its correct-
ness at common law. But how stands the question when viewed
in the light of the provisions of our Constitution? At common
law, and, we suppose, in most of the States, to plead successfully
former acquittal, the first trial must have been upon a good and
sufficient indictment, information or complaint. Is this the case
in this State?

Section 14 of the Bill of Rights reads: "No person for the

same offense shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction." In some States it is held that jeopardy does not attach until verdict is rendered. In this State it is now held, and was at the time of the making of the Constitution, to be the law of this State that, where the accused pleads to a good indictment before a court of competent jurisdiction, and the jury are sworn to try the case, jeopardy attaches.

Now, if this be so, why provide that no person shall again be placed upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction? Is it not evident that this is inhibited by the jeopardy clause of the Constitution? Would any court permit a party to be again tried for the same offense, when he had been tried upon a *good and sufficient indictment,* before a court of *competent jurisdiction,* and acquitted by the jury? Does it require a constitutional provision to shield him from a second trial under the above facts? We think not.

But, as it frequently occurs that an accused is placed upon trial for an offense before a court of competent jurisdiction upon indictments vicious *in substance,* and that long and tedious trials are had, resulting in verdicts of acquittal, was it not the intention of the Constitution to say to the State that the accused shall not be tried again for the same offense though the indictment was in substance insufficient? After a most thorough examination of this subject, we are of the opinion that this was the intention of the framers of the Constitution. We could enlarge upon this subject, but have not the time.

Before leaving this subject we desire to give some illustrations as to what we mean by the *same offense.* A is charged, in the first instance, with the murder of B by shooting him. He is acquitted. In the second indictment he is charged with the murder of B by stabbing him with a knife or by striking him with a stick or bludgeon. The offenses are not the same, and, if the first indictment had been good, A could not have been convicted of the offense charged in the second indictment.

Again: A is charged with the theft of a bay horse, the property of B, and is acquitted. He is again placed upon trial for the theft of a white horse, the property of B. Though the transaction be the same, the offenses are not the same. But let us suppose that the indictment charging the theft of a bay horse, the property of B, fails to allege that it was fraudulently taken,

or that it was taken without the consent of' the owner, or fails to allege that the accused took the property with the intent to deprive the owner of the value, etc. If the accused is acquitted, he can plead this acquittal in bar of another prosecution under a *good and sufficient* indictment—one which charges him with the theft of the same bay horse, the property of B, on an indictment containing all the elements of theft properly alleged.

If, therefore, the accused can be acquitted under a bad indictment, information or complaint, the court having jurisdiction of the cause of action—the offense—and this acquittal can be successfully pleaded to a second prosecution, may not a witness be guilty of perjury for false swearing upon the trial, though the jurisdiction of the court may not have lawfully attached? For, if the court has jurisdiction of the offense—the subject matter—and a trial results in a verdict of not guilty, the State is forever debarred from another prosecution for the same offense; and the false testimony of a witness may, and no doubt would, in many cases contribute to an acquittal, and thus defeat the ends of justice.

Just here let us give another illustration. All prosecutions originating in the county court must be presented by information, and the information must have for its support a complaint verified by the affidavit of some credible person. Now, let us suppose the accused is placed upon trial upon a good information, and is convicted and fined one hundred dollars. He pays his fine and is discharged. Afterwards it is discovered that there was no complaint. Now, then. the jurisdiction of the county court had not properly attached, and yet the accused has been tried upon a good information before a court of competent jurisdiction. Will it be contended that because there was no complaint, a witness who swears falsely, deliberately, willfully and intentionally can not, and should not, be convicted of perjury when it may be that the accused was convicted solely upon his false testimony? We would hesitate long before we would sanction such a doctrine. But, suppose the accused be acquitted by verdict of not guilty, this would be a bar to another prosecution, when it may be that this verdict was obtained by the false testimony of a witness who, if we are wrong in our views upon this subject, is beyond the reach of the penal laws of this State. To this we can not agree.

Concede that the jurisdiction of the court had not properly attached to the particular case, yet there was a trial before a court

of competent jurisdiction, upon a charge of an offense, and, though not properly before the court, its adjudication, if resulting in a verdict of not guilty, has such force and effect as will enable the accused to plead that the matter was *res adjudicata*, plead this trial before a court of competent jurisdiction and verdict of not guilty in bar of another prosecution. The judgment in such a case would not be a nullity as to both the State and the accused, for, while the State would be bound by it, the accused, if convicted, would not. The State being bound by such a judgment, by reason of such a trial and verdict, we are clearly of the opinion that a witness swearing falsely upon such a trial would be guilty of perjury.

In the indictment, perjury is assigned upon both material and immaterial matter. The court below very carefully confined the jury to that which was material and properly assigned as perjury, requiring the jury to believe beyond a reasonable doubt, from the evidence, the material matter which had been properly assigned as perjury, before they could convict; thus eliminating all immaterial matter from the issue. But the jury were instructed to look to all the evidence before them which, in their judgment, bore upon the question, in determining whether or not defendant testified on the trial of Green Wright that he (appellant) saw Wright have a pistol on the occasion referred to in the charge above, and, if so, whether such statement was true or false.

Counsel for appellant objects to this part of the charge because, as it is urged, the jury were authorized by it to convict upon immaterial matter. We do not so understand the charge. Perjury can be established by circumstances, as well as may other offenses. Let us suppose that the witness in his testimony gave a circumstantial account of the material facts, and that perjury is assigned upon the material facts, the prosecution would be permitted to prove that he swore falsely as to the circumstantial, though immaterial, in aid or corroboration of the evidence adduced to prove that he swore falsely as to the material facts.

There are other objections urged to the charge, but we do not believe they are obnoxious to the criticisms urged by counsel, and, taken as a whole, it is a good application of the law to the facts of the case.

Counsel assigns for error the overruling of the motion for new trial, because the verdict is unsupported by and contrary to the

evidence. Perjury must be established by the testimony of at least two credible witnees, or of one witness corroborated strongly by other evidence, as to the falsity of defendant's statements under oath. One witness swore positively to the falsity of defendant's statements, and he was *very strongly* corroborated by the testimony of other witnesses, as well as by the circumstances of the case. Hence, viewing the case in the light of the evidence which supported the verdict, we think the measure of the law has been filled. But, if the witnesses for defendant swore the truth, there was no perjury. There being a conflict, it was the province of the jury to settle this matter, which was done against the veracity of his witnesses; from which this court can not furnish relief.

After a mature consideration of this case, we have found no such error as will justify a reversal of the judgment, and it is affirmed.

*Affirmed.*

Opinion delivered at Tyler, December 8, 1886.


## ON MOTION FOR REHEARING.

HURT, JUDGE. The question herein raised arises on a motion for rehearing. While it was considered and passed upon in the opinion affirming the judgment, it was not discussed at length. Being again pressed in support of the motion, it will be more extensively treated.

Perjury was assigned upon the statement that appellant Anderson saw Green Wright have a pistol at the Masonic hall in Henderson county, where the colored people were holding a festival. The charge of the court in the most explicit terms directed the jury to a finding upon the truth or falsity of this statement. The instruction on this head was to the effect that, though they might believe that the other evidence given at the same time and upon the same trial by appellant was false, yet, in order to convict, the jury must conclude that this particular statement upon which the perjury was assigned was false. After this instruction, in which the court carefully confined the issue to the truth or falsity of the statement, the further instruction was given that the jury would look to all the evidence given before them, which, in their judgment, had a bearing upon the question, in determining whether or not defendant testified on the trial of Green Wright that the said Wright had a pistol on the

occasion referred to; and, if so, whether such statement was true or false.

. Upon the trial of Wright for carrying a pistol, appellant, Anderson, testified, in addition to the fact that Wright had a pistol, to certain attendant circumstances, such as that he (Wright) took it out from a pair of saddle bags in the presence of certain named persons. Perjury was assigned upon the concomitant statements also. There was evidence strongly tending to show that each of them was false.

It is evident that, although the charge confined the jury to the statement assigned as perjury, viz., the appellant saw Wright have the pistol at the festival at the time and place named, the jury are required by the charge to look to all the evidence, and hence to all the statements made by Anderson, whether assigned for perjury or not, in determining whether the statement assigned was true or false. To the instruction requiring the jury to look to all the evidence in determining the truth or falsity of the material statement assigned as perjury, counsel for defendant earnestly and with great confidence objects, and in support of the objection relies upon the case of The State v. Brice, 43 Texas, 532. The case is in point, and most clearly supports the objection.

Before entering upon a review of the Brice case, we desire to make some observations, with regard to a question sometimes used with reference to perjury. It frequently happens, in well considered decisions of the court, that the words "material," "immaterial," or "facts" are incautiously used. No "facts," "matter," or "statement" is material unless assigned as perjury, nor unless the fact or statement thus assigned is relevant to the issue in the case. This is the case in a particular sense, but not in a general sense. If not assigned as perjury, the fact or statement, though material, and though it could have been properly assigned, and though evidently false, a conviction upon it can not be had.

But suppose the matter or statement is not assigned for perjury, does it follow that because not asssigned it can not be relevant and competent evidence in determining whether the statement assigned is or is not false? The Brice case so holds, but to this conclusion we do not agree. Instance the case before the justice against Green Wright for carrying the pistol. Appellant, Anderson, is a witness upon the trial. He swore that he saw Wright have a pistol at the old Masonic hall in Henderson

county, where the colored people were holding a festival at the date charged in the complaint. The State then closed its examination. Upon cross examination Anderson goes into the particulars, relating, amongst other things, that in the presence of certain named parties he saw Wright take the pistol from his saddle bags. Defendant introduces as witnesses the persons named, and proves beyond question by them that they were present as stated; that they saw Wright, but did not see him have a pistol; that they saw no saddle bags, and that he had none with him. What legitimate use can a defendant make of this impeaching testimony? Undoubtedly it can be used to impeach the witness. The reasoning being that, as he swore falsely about the saddle bags, he also swore falsely about the pistol. This needs no further illustration, it being self evident.

In harmony with this is the case of Rex v. Gardener, 8 C. P. 737. Gardener was indicted for perjury in "falsely deposing before a magistrate that the prosecutor had a venereal affair with a donkey, and that the defendant saw that the prosecutor had the flap of his trousers unbuttoned and hanging down, and that he saw the inside of the flap. To disprove this, the prosecutor and his brother were examined. The former negatived the whole satement, and both witnesses swore that they went to the field mentioned in the deposition, and that the prosecutor parted from his brother to see whether the donkey, which was full in foal, was able to go a certain distance; that he was absent about three minutes; that the trousers he had on (which were produced) had no flap. In this case the evidence was held not only admissible but sufficient corroborative proof to sustain a conviction. It must be remembered that perjury was not assigned upon the statement relating to the flaps of the prosecutor's pants, but if in fact there was no flaps to his pants, this would be a very cogent reason for believing that the entire statement with regard to the "venereal affair" with the donkey was a sheer fabrication.

Believing the doctrine of the Brice case to be unsanctioned by reason and authority, it is hereby overruled. As also establishlishing the doctrine that, on a trial for perjury, cognate perjuries may be proved, see Wharton's Criminal Evidence, section 53, and The State v. Raymond, 20 Iowa, 528.

Separately and in consultation we have carefully examined the statement of facts, with the result of reaching the same conclusion as that announced in the opinion heretofore filed in the

case. That there is much conflict in the testimony is true, but in passing upon its sufficiency to support the judgment, we are to take as true that which would support the verdict.

Viewing the testimony in this light, we can not say that it does not support the finding of the jury, and the motion for rehearing must therefore be overruled.

*Motion overruled.*

Opinion delivered at Galveston February 23, 1887.