## SAM HAMBLIN v. THE STATE.

### *No. 641.   Decided April 24.*

**1. Murder—Evidence of Deceased at Former Examining Trial—Impeach-
ment of.**—On a trial for murder, where it appeared that the deceased, before his
death, had testified at an examining trial in which defendant was then charged with an
assault with intent to murder him, and his testimony at said trial was introduced by
the State, *Held*, that evidence impeaching said testimony, by showing subsequent
contradictory statements thereof by deceased, was legitimate and competent, though
the same was not offered as dying declarations, and though no predicate for impeach-
ment was laid, it being impossible, in the nature of the case, to lay a proper predi-
cate, and said contradictory evidence not being objectionable as hearsay.

**2. Same.**—If the rule be a sound one that the evidence of a deceased witness can
be reproduced, then it should follow, that his testimony could be attacked in any
way that any other witness may be impeached.

**3. Same—Exclusion of Competent Evidence Harmless, When.**—On a trial
for murder, where the evidence, independent of the proposed impeaching testimony,
is so strong and conclusive that no jury seeking to do their duty would or ought
honestly to have returned any other than a verdict for murder, *Held*, that the exclu-
sion of competent impeaching evidence was harmless error.

APPEAL from the District Court of Taylor.   Tried below before
Hon. T. H. CONNER.

This appeal is from a conviction for murder of the first degree, with
penalty assessed at imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of one John
Baker, in Taylor County, on the 26th day of December, 1892.   Under
instructions of the court, we report the facts proved on the trial of the
case substantially as follows, viz:

Dr. J. T. Hensley testified:   He was called to see John Baker, the
deceased, between 11 and 12 o'clock on the night of December 26,
1892; found him lying on the floor of the Corrigan Hotel, in the village
of Merkel, suffering from several incised wounds on the neck and face,
which he (witness) did not regard as serious.   He also had a gunshot
wound in the back; it passed through the eleventh dorsal vertebra,
wounding the spinal cord, and the ball lodged just inside the abdomi-
nal cavity.   This wound was necessarily fatal, and Baker died from
the effects of same some twelve or thirteen days afterwards.   After his
death, he (witness) extracted the bullet from the wound at the post
mortem.   The witness here produced the ball, and said it looked like
a 44 or 45 caliber.   This witness also stated, that as he was going to
the hotel he noticed the moon, and it was just above the horizon in the
west.

Dr. A. L. Grizzard testified substantially as did Dr. Hensley about
the wounds upon the person of the deceased, Baker, and saw the bullet
taken from Baker's body at the post mortem, at which he assisted.

J. W. Brooks stated, that he was engaged in the saloon and livery
business at Merkel.   That on the night of December 26, 1892, defend-
ant, Sam Hamblin, Elzy Easterwood, and deceased, John Baker, all

of whom he knew, came into his saloon between 11 and 12 o'clock at night.    There were a number of persons in the saloon at the time they came.    Thinks Feazer, Jinks Clark, and Boyett were there.    Heard defendant abusing Baker about something the latter had sworn in a steer case at Sweetwater.    "He said he was a friend to the Cogginses, Bill Barbee, and the Easterwoods; that deceased was a damned son of a bitch, and had sworn to lies.    Baker told him he was not armed, and did not want any trouble.    Defendant struck him several times in the breast, and then told Baker he had to set up the drinks to the house. Baker told him he did not have any money, and Hamblin said, 'Your credit is good,' and asked me if it was not.    I set out perhaps a dozen glasses, and quite a number drank.    Defendant drank.    I am not certain whether Easterwood and Baker drank.    When defendant was abusing Baker, as above stated, Baker put down his hands as if to put them in his pants, when defendant drew his pistol and made him put his hands upon the counter.    I told him to let him alone; that I thought he was a first-rate fellow.    Defendant replied, 'I know him a damned sight better than you do.'    Hamblin struck on a box several times with his pistol, and then jobbed it down barrel end on the counter three or four times, hard enough to make an impression on the counter.    I could see part of the pistol.    It looked to be a 44 or 45.    Hamblin, Easterwood, and Baker, together with a large crowd, left the saloon about the same time, and when they left defendant had hold of Baker.    A short time after they left, defendant came back into the saloon and whispered to me that John Baker said to send him a pint of whisky. I gave him the whisky, and he left, and I saw him no more that night. I closed my saloon and went to my room, and suppose I had been in my room a half or three-quarters of an hour, perhaps not so long, when I heard two pistol shots in the direction of the Corrigan Hotel, and heard a horse running down the road west of the hotel.    Heard some one calling, and went over to the hotel, and there found Baker shot."    [This witness described the location of the hotel and streets of the town, and his place of business.]

Bob Martin testified:    Was in Merkel on the night of December 26, 1892, attending a dance.    The dance broke up about 11 o'clock. That he got his horse and went to the Corrigan Hotel, and was waiting there for John Baker, as they were going home together.    "While at at the hotel Lem Jeffries came in and spoke to me, and I left immeately to find John Baker.    Went to Brooks' livery stable, and saw some parties standing down by the south gate of the stable lot.    I thought I recognized John Baker, and said, 'Is that you, Johnnie?' He says, 'Yes.'    I says, 'Come on and let's go home.'    He says, 'All right.'    He was with the defendant, Sam Hamblin, and Elzy Easterwood.    There was no one there except those three.    We four then started across towards the Corrigan Hotel.    Baker was leading his horse, and Sam Hamblin caught hold of the rope on the horse and said, 'Hold on; let's all have a drink.'    And we all took a drink out

of a bottle.   We went to the corner of the hotel, I in front.   The others stopped at the corner of the hotel, and I went into the office to get my coat and gloves.   Met Grant Harris in there, and he proposed that we go to Warren's and get something to eat.   We started to Warren's, leaving Baker with Sam Hamblin and Elzy Easterwood, standing near the southeast corner of the hotel.   I told John Baker to wait a few minutes for me; that I was going to get something to eat. Harris and I went to Warren's, about 100 yards, and had cut open and were eating some canned goods, when we heard two pistol shots.   I got up, leaving Harris, and went out.   When I got to Cravens' corner, across the street from the hotel, I heard a voice like the person was in pain, saying, 'O, Bob.'   I could not locate the voice at first, so I ran up toward the livery stable, and stopped when I heard the voice call again, 'O, Bob.'   I thought the sound came from around the hotel, so I ran around the south side to the west side of the hotel, and there found John Baker lying on the ground.   Just as I reached him, he said, 'Bob, they have killed me.'   I said, 'Johnnie, who did it?'   He says, 'Sam Hamblin and Elzy Easterwood.'   I took him up and carried him to the west end of the gallery, and went in and got Grant Harris and Mr. Corrigan to help me take him into the house.   When we got him into the house, I again asked John Baker who hurt him, and he said Sam Hamblin shot him and Elzy Easterwood cut him. That Sam Hamblin shot him twice and then ran off, and that Elzy Easterwood came to him and stooped down, and that he (Baker) said, 'Elzy, carry me on the porch,' and he said, 'All right.'   He said Elzy Easterwood took him up and carried him around the vacant house and laid him down and commenced to cut him.   It was not over ten or fifteen minutes from the time I left Hamblin, Easterwood, and Baker at the south side of the hotel until I heard the pistol shots.   I found him about sixty feet from where I left them to go with Harris to get something to eat.

G. W. Jernigan testified, that he was justice of peace, and as such magistrate he held an examining trial about the last of December, in a case wherein the defendant, Sam Hamblin, and Elzy Easterwood were charged with assault with intent to murder John Baker, on the 26th of December.   Defendants were both present in person and by attorneys.   That John Baker was not able to be brought to the court room, and that he (the justice), together with the defendants and their attorneys, went to the room of said Baker at the Corrigan Hotel, where Baker was sworn as a witness, and his testimony, both upon examination and cross-examination reduced to writing, and was read over to and was signed by the said John Baker.   That said examining trial was for the same assault from the effects of which Baker afterwards died, and which is the basis of this prosecution for murder. That John Baker is dead.

The State then introduced the following as the testimony of John Baker:   "My name is John Baker.   On the night of the 26th of De-

cember, 1892, they had a dance up here at the hall. The dance broke about 11 or 12 o'clock. I came to the stable to get my horse—the stable near Brooks' saloon. I went into the stable to get my saddle out. I saddled my horse, and went into the saloon to get the boys to go out home with me. Sam Hamblin caught me by the arm, and said, 'Come in here and let's get a drink.' We, Sam Hamblin and myself, walked up to the bar. I told him I was broke, and had no money. Hamblin said, 'Brooks will credit you.' Brooks said, 'No; I can't credit him.' He kept on, and Brooks said, 'I will credit him with one drink for the whole house.' Here awhile back the county officers of Nolan County had me up before the grand jury about a steer case, a D B steer that Bill Barbee took from Dulaney, that did not belong to Barbee. Hamblin commenced cursing me about going to Sweetwater and swearing a lie against Bill Barbee. He (Hamblin) said if I did go up there and swear that Bill Barbee stole a steer from Dulaney, that it was a God-damn son of a bitch of a lie. He also called me a son of a bitch. He struck me a time or two in the breast, and hit me on the jaw once. I believe I started to put my hands in the waist of my pants, and Hamblin drew his pistol on me and made me put my hands upon the counter. This occurred after I treated the crowd. I told Hamblin to let me go home, as the other boys I was with had gone. I told him I wanted to catch them. Hamblin said, 'No, damn you; I want you to drink some more.' Elzy Easterwood was in the saloon at the time I was in there. Easterwood went into the saloon with me and Sam Hamblin. I did not resent any of the abuse Hamblin gave me. We came out of the saloon. I mean by we, Sam Hamblin, Elzy Easterwood, and myself, and we came down the street on the east side of the Corrigan Hotel. We stood in front of the Corrigan Hotel, facing the railroad, and talked awhile. Sam Hamblin said, 'Let's go in between these houses and have something to drink.' He grabbed me by the arm, and said, 'Come on.' We went on the west side of the Corrigan Hotel and all took a drink, and then I said, 'Fellows, I must go, sure.' I started on ahead, leading my horse. I heard Sam Hamblin cock his pistol, and I 'sorter' turned my head. About the time I turned my head, Sam Hamblin fired. I saw the flash of the pistol. I recognized Hamblin. Easterwood was standing by his side. The ball hit me in the small of the back. Then I fell backward. My head was pointing towards the north. When I fell, Sam Hamblin ran around to the right of me and got about south of me and shot again, but did not hit me. They ran in at a gate north of the hotel, at the northwest corner of the hotel. My horse broke loose, and I was trying to scramble around to get on the front porch of hotel, and the first thing I knew, Elzy Easterwood ran right up to the side of me. I said, 'Elzy, carry me around here on the front porch.' He said, 'All right,' and picked me up and went carrying me back the other way to the end of the other house, west of the hotel—to the north end of the old house. He tried to put me inside the door of the old house. I pushed

on the door and pushed myself back, and he (Elzy Easterwood) pulled out his knife and went to cutting me. He cut me several times around the neck, and then ran away and went right northwest. When Elzy Easterwood carried me to the north end of the old house, he caught me under the arms, and my feet dragged on the ground. When I fell down at the north end of the old house, Elzy Easterwood stooped to his knees and began sticking me with his knife. I knocked off the blows all I could with my hands. I was lying on my back when Easterwood left me. When Easterwood left me I was not able to resist him. I then began to call Bob Martin, and he came and carried me to Corrigan's Hotel. No one helped Martin carry me to the hotel. I was lying out at the old house about a minute when Martin came to me. My horse was tied close to the saloon, to the fence near the livery stable. He was tied to the livery stable fence. At the time Hamblin shot me we had no hard words. My back was turned to him when he shot me. I suppose it was about fifteen minutes after we left the saloon till I was shot. I had only taken one or two drinks when I was shot. I had been drinking but little. I had never had any difficulty with either one of the parties before. The best of my recollection is, that I was at the end of the old house when Bob Martin found me. Hamblin pointed his pistol to the south when he shot at me the second time."

Cross-examined, by the defendants: "I think I am in a condition to remember everything that took place that night; my recollection seems to be as good now as it was before I was hurt. I got in town that evening about 4 o'clock. I saw Hamblin and Easterwood about ten minutes after I got in town. We met and spoke friendly. I attended the ball in Merkel that night. Easterwood and Hamblin were at the ball. They both took part in the ball. I think both danced, but am not sure. The ball broke up about 11 or 12 o'clock. I don't remember saying anything to Easterwood and Hamblin at the ball, but I passed them several times in the hall. They seemed friendly all during the dancing. I came down to the saloon from the hall by myself. I believe some men were in front of me and some behind me. I went in the saloon by myself. Bob Martin and George Burch were all the men in the saloon when I first went in. I think I staid in and around the saloon about an hour or more. I think Hamblin and Easterwood came to the saloon about a minute after I came. Neither one spoke to me when they first came in; it was twenty-five minutes I guess before they spoke to me. Sam Hamblin first spoke to me and wanted me to treat, and commenced about the steer. He said, 'John, treat. God damn you, what is the matter with you?' I told him that I was broke; I had no money. He spoke 'sorter' short, like he was mad. I had had no difficulty with him up to that time. I don't remember that Easterwood said anything up to that time. I treated the first time. Hamblin and Easterwood drank with me; five or six drank when I treated. Hamblin and Easterwood drank with me.

Hamblin then began to swear out about that beef. The brand on the steer was D B, and located on the left hip. Hamblin said it was the D B steer that Barbee was accused of stealing. I don't remember whether he said it was Dulaney's or not. Hamblin, in talking about the steer, talked like he was mad. Hamblin called me a son of a bitch. Up to that time, as far as I know, our relations were friendly. At the time Hamblin was talking about the steer, I do not remember Easterwood saying anything about the steer. Easterwood and I were friendly up to that time. Sam Hamblin had a pistol in the saloon. I got a glimpse of his pistol in the saloon, but I don't know what the caliber was. Hamblin had it in his right hand when I saw it. He did not attempt to shoot off his pistol in the saloon. I don't remember all who were in the saloon at the time. Elzy Easterwood, Grant Harris, Bill Barbee, and several others were in the saloon. At the time I went down to the saloon by myself, and Hamblin abused me, I reckon I was there about twenty-five minutes. This was the last time I was at the saloon that night. I went up to the Corrigan Hotel, as I told you before, and then we went around the house. We came down on the east side of the hotel. The hotel is about southeast of the saloon. The saloon is about seventy-five yards from the hotel. No one was with me when I went to the hotel, except Hamblin and Easterwood. My horse was hitched near the saloon to the livery stable fence. I led my horse as we came to the hotel. We stopped five or ten or fifteen minutes in front of the hotel. I don't remember exactly how long on the south side of the hotel. We talked about the steer, and first one thing and then another. I don't remember that Easterwood said anything about the steer as we were standing in front of the hotel. In the conversation, Easterwood and Hamblin sometimes talked friendly and then they talked mad. We talked and laughed some. We took a drink while we were there, and Hamblin furnished the whisky. Hamblin invited me to drink with him. Hamblin did not go back into the saloon the last time. I was in the saloon with Hamblin and Easterwood twice that night. Sam Hamblin suggested that we take a walk down to the hotel. I don't know the time we left the hotel that night, whether it was before or after 12 o'clock. I think it was as late as 11 o'clock. I could not say whether it was as late as 12 o'clock or not. I stood and held my horse in front of Corrigan's Hotel. I drank once in front of the hotel. I don't think I drank any more. I made an effort to start home, and Hamblin said, 'Hold on; let's have another drink;' and he caught hold of my arm and led me around the house, and we took another drink. Then I said, 'Boys, I must pull home,' and I started off. I heard Hamblin cock his pistol, and as I looked around he shot. I went, I reckon, about five steps from where we took the first drink before I was shot. I don't think the moon was shining; it was a starlight night. Hamblin was about five steps from me when he shot. Easterwood was standing beside Hamblin when Hamblin shot me. I am positive Ham-

blin shot me. He shot me with a pistol. I saw the glimpse of the pistol. He shot at me twice. He only hit me once—the first shot. It was not overly dark when he shot me. I was between Corrigan's Hotel and the old house when Hamblin shot me. He walked to my right, shot at me again, and then went through a gate at the corner of the hotel, and that was the last I saw of him. The last time Hamblin shot at me, he was four or five steps from me. He was standing on the north side when he first shot, and on the south side when he shot again. Easterwood was still on the north side of me when Hamblin shot the second time. He never ran around with Hamblin. The second time Hamblin shot they both went northeast in the direction of the gate at the corner of the hotel. I saw Hamblin no more that night. Easterwood came back, and I asked him to carry me to the front of the hotel, and he picked me up and dragged me the other way, behind the old house. Easterwood came back in a minute or a half a minute. I was shot along about 11 or 12 o'clock, or maybe after 12. I can't say for certain. It was five, ten, or fifteen minutes, somewhere along there, after I left the saloon before I was shot. Elzy Easterwood cut me about the face and neck. He cut me with a knife. I saw the knife; it was a long knife, but not very large. It was a slender blade. I don't know the color of the handle. I am positive it was a pocket knife he cut me with. I was at the north end of the old house when Easterwood cut me. He cut me five or six times. He never said a word while he was cutting me. I could tell men I knew well, that night, five or ten steps. I could tell them by their figures and by their faces. The man that shot me had on a dark striped suit of clothes. He had on a black hat and a light overcoat, and I think it was a ducking overcoat. The overcoat was not buttoned at the time he shot me. The man that cut me had on a dark suit of clothes; I think he had on a black hat, but don't know for sure. The man that cut me would weigh about 165 or 170. The man that cut me had no beard on his face, but was shaved all but his mustache. His mustache was light; he did not have a heavy mustache. I think the one that cut me has blue eyes; I ain't sure, but I think he has. The man that shot me had a beard on his face. He had a chin beard. Bob Martin was the first to come to me after Easterwood left. He took me into Corrigan's Hotel. Nobody helped Bob to carry me into the hotel. I have known Sam Hamblin about two years. I first met him in Abilene, Texas. Nobody introduced us. We were at the court house steps. I have seen him frequently since that time. I have known Elzy Easterwood about five years. We, Easterwood, Hamblin, and myself, have always been on good terms.

[Signed] " JOHN $\overset{\text{HIS}}{\times}$ BAKER." $\underset{\text{MARK}}{}$

George Hunter testified, that he was at the ball; that it broke up between 11 and 12 o'clock; that he went to Brooks' saloon, where he

saw Elzy Easterwood, Sam Hamblin, and John Baker. In a few minutes after he got there, these parties left the saloon. About five minutes afterwards, Hamblin returned and whispered something to Brooks, and Brooks handed Hamblin a bottle of whisky, and Hamblin went out. Soon thereafter he and Jim Feazor started home, and at Cravens' corner saw several persons at the south side of Brooks' livery stable, near the gate to the fence. At Cravens' corner saw Elzy Easterwood, who said to witness, "I must lope over there," and he went over to Corrigan's Hotel. Witness then went home and went to bed, and just as he got in bed he heard two shots fired. This was between twenty and twenty-five minutes after he had met Baker and Hamblin at the saloon. When he last saw Easterwood, after they parted, he (Easterwood) was going in the direction of the old vacant house, near which Baker was shot.

George Baggett testified, that he was at the ball, and after it broke up went down to Cravens' corner, and while there heard some shooting near the saloon, and heard some women scream over at the hotel. After this, saw some men and women leave the hotel and go northwest. He then went to Brooks' saloon to get Boyet, who was drunk, and there saw Baker, Hamblin, Elzy Easterwood, and others. Got Boyet and came back as far as Cravens' corner, where Boyet left him, and went back to the saloon. He says: "I went again for him, and as I came back saw Hamblin and John Baker on the south side of the livery stable. At the corner of the stable I met Elzy Easterwood coming from the direction of the hotel. I asked him to help me with Boyet. He said, 'I have a man of my own to look after.' This was after I had seen the women leave the hotel. I had made one trip to the saloon, carried Boyet off, and had gone back after him the second time. Boyet left me and went to the saloon again, and I went after him the third time, and on this trip I saw Hamblin, Easterwood, and John Baker on the south side of the livery stable. I carried Boyet to his barber shop. A few minutes after I got to the shop, Lem Jeffries came to the shop and handed me Boyet's pistol. This was after I had made the last and third trip to the saloon."

Will Hamner testified, that he and John Baker had come to town together, and after the ball they went to the stable to get their horses, as they were going the same road home. He went in the stable for his saddle, and when he came out Baker was gone. He went to the hotel, hitched his horse, and waited about ten minutes for Baker. He then went out to where he had hitched his horse, and found the horse gone. He went after the horse, and finding him about a quarter of a mile west, started on home. A short distance from the railroad tank, which was about two or two and one-half miles from Merkel, Baker's horse, which was running rapidly, passed witness, and witness, thinking something was wrong, went back to town and found Baker shot.

Jim Corrigan testified: Was keeping a hotel in Merkel the night of the 26th of December, 1892. After the ball broke up, Hendrix and

wife, Barbee and wife, and Elzy Esterwood and wife, came to the hotel, remained sometime, and then left. About twenty minutes after they left, witness heard two shots fired west of his hotel, and soon after Bob Martin came in and said John Baker was shot. Bob Martin, Grant Harris, and myself carried Baker into my house, where, in answer to a question as to who hurt him, Baker said, ''Sam Hamblin shot me, and Elzy Easterwood cut me.''

H. C. Hayter testified, that the morning after Baker was shot he examined the ground very early. Found a pool of blood at the back door of an old vacant building, and also a hole in the ground about midway in the vacant space between the hotel and the old house, which appeared to have been made by a bullet. From this hole found two drags, as if made by a man's boot heels dragging on the ground. They began at the hole and extended back to the door of the old house. This old house is just west of and adjoining the Corrigan Hotel. This witness prepared and used a diagram of the localities surrounding the place of the shooting. A copy of said plat is hereto attached.

The State then introduced a certified copy of the indictment from Nolan County, charging Bill Barbee with theft of cattle belonging to Jeff Dulaney, showing that the said indictment had been presented in the District Court of said county at the fall term, 1892.

With the above, the State closed.

Will Trent testified, that he was at Merkel, and took a young lady to a ball, on December 26, 1892. The ball broke up about 11 or 12 o'clock. After taking the young lady to Randall's he returned to the Corrigan Hotel; sat around awhile, and then went to bed. After he had gone to bed, heard two shots fired. In about twenty minutes John Baker was brought into the hotel, wounded. These shots were fired about an hour or an hour and one-half after the ball broke up.

On cross-examination he stated, that the young lady he escorted to the ball was Miss Lou Easterwood, sister of Elzy Easterwood. That Elzy Easterwood had married a Coggins, and that witness was related to the Cogginses. He says he thought the moon was shining that night. He said in going from the ball to Randall's and back to the hotel he saw no one and no horses about the saloon, livery stable, hotel, or vacant house by the hotel. Did not see any women at the hotel upon his return there.

Mrs. W. H. Kendrix testified, that she was at the ball. The ball broke about 11 o'clock. She and her husband, Bill Barbee and wife, and Elzy Easterwood and wife went together to the Corrigan Hotel, staid there about fifteen or twenty minutes, and then all these parties started to Elzy Easterwood's house, which was about one-fourth of a mile from the hotel. That when they got in front of Brooks' saloon, Elzy Easterwood told his wife to go on, and he would be there directly; that he wanted to go over and get Bun Easterwood off home, and he left and went to the saloon. After the others reached the house, Barbee and Kendrix made up a fire. She says: "We only had time to warm and then take off our wraps, when Elzy Easterwood came in with Tommy Carruth and Lem Jeffries. We had not been in the house more than five minutes when Elzy Easterwood came back. About an hour or an hour and a half after we reached the Easterwood house we heard distinctly two pistol shots down towards town." Those were the only shots the witness heard after the parties left town. At the time these shots were fired Elzy Easterwood was there in bed.

On cross-examination, the witness testified, that she did not see Sam Hamblin after the ball broke. Heard no one outside of the house after Easterwood came. A short time after he came, however, Barbee and Kendrix went out, and soon returned, saying they had been down to Dodson's with Sam Hamblin, Lem Jeffries, and Tom Carruth. Did not stay long at Elzy Easterwood's. They were there when Kendrix and Barbee came back and said they had been down to Dodson's. When they left, they said they were going to Coggins'. They had been gone sometime when the shots were fired. Easterwood sat up an hour or two and then went to bed, and was in bed when the shots were fired.

He had been in bed sometime before they were fired.   At the time the shots were fired, Mrs. Barbee and husband were fixing to go to bed. It was a moonshiny night.

John West testified, that the ball broke up about 11 o'clock, after which he went to McMillan's drugstore; staid there perhaps half or three-quarters of an hour.   Came back to the hotel, sat around a few minutes, and then went to bed.   Had been in bed about an hour, reading a novel, when he heard a pistol shot west of the hotel, and about twenty minutes after, John Baker was brought into the hotel. Heard but one shot fired.   When Baker was brought in, witness went down stairs, and when he got to him, heard Baker say, that Sam Hamblin and Elzy Easterwood had killed him.   He said, "Sam Hamblin shot me, and Elzy Easterwood cut me."

Bill Barbee testified: "I am brother-in-law of Elzy Easterwood. We married sisters of Tom Coggins.   Was at the ball.   The ball broke up about 11 o'clock.   After the ball, Kendrix and wife, Elzy Easterwood and wife, and myself and wife went to the hotel.   Staid ten or fifteen minutes, when all started to Elzy Easterwood's to stay all night.   As we got opposite to the saloon, Elzy Easterwood turned off and went to the saloon.   He said Bun Easterwood was drinking, and he was going to have him go home with Mem Pate.   About ten or fifteen minutes after he left us he came to his house, where we were, and I saw him when he came in.   Sam Hamblin, Tom Carruth and Lem Jeffries were at the gate, talking.   I suppose they came with Easterwood.   Hamblin called to me from the gate, and asked me to go with him to Dodson's; that he wanted to see if his wife had gone to bed.   Kendrix, Hamblin, and I went to Dodson's.   It took about ten minutes to go and return.   When we returned, Hamblin asked Jeffries to go down and sleep with him, and they went to Hamblin's house, which is in the same inclosure with Easterwood's.   We sat for some time after this.   An hour or an hour and a half after the ball I heard two shots.   At the time they were fired, Lem Jeffries and Tom Carruth had gone; Jeffries left first with Hamblin.   That day Hamblin was smooth shaved, except his mustache.   He wore a cap that night.   He was drunk that night.   It was a moonshiny night.   I know the moon was shining as we went to Dr. Dodson's.   It was then about an hour high.

Cross-examined: "I am the Bill Barbee charged with the theft of a steer belonging to Dulaney, in Nolan County.   Elzy Easterwood was in bed when the shots were fired.   No one else had gone to bed at that time.   We had been at Easterwood's at least an hour before the shots were fired.   It was but a very few minutes after Lem Jeffries and Sam Hamblin left when I heard the shots fired.   Jeffries is a brother-in-law of defendant Easterwood.   Tom Carruth is my nephew, and also a nephew of Elzy Easterwood."

Tom Blair testified, that he was stopping at the Corrigan Hotel that night.   Saw some ladies leave the hotel about thirty minutes after the

ball broke up. After they left witness went to bed, and about a half or three-quarters of an hour after they left he heard two shots fired. They were fired an hour and a quarter after the ball broke up, and in about twenty-five minutes John Baker was brought into the hotel.

Dr. Dodson testified: "Sam Hamblin's wife staid all night at my house that night. I was awakened by a dog running across my back porch, and heard the clock strike 11 or 12 o'clock; don't know which. Just a moment afterwards I heard Sam Hamblin call at the door and ask if his wife was there. I told him yes; to go in and go to bed. He said no, he would go down to the ranch. That evening I noticed that Hamblin was clean shaved, and he wore a cap."

Bob Martin, recalled, testified, that Sam Hamblin had on a cap that night.

Mem Pate testified, that he did not know deceased, John Baker, but that night, after the ball broke up, as he and Bun Easterwood were passing Cravens' corner, they met a man, and Bun said, "Hello, John," and the man said, "Hello, Elzy." "I asked Bun Easterwood who it was, and he said it was John Baker. I saw Elzy and the crowd he was with start from the hotel. I then went to the saloon, and there met Lem Jeffries, Sam Hamblin, and Tom Carruth near the front of the saloon. Elzy Easterwood came to us in a few minutes, and after talking a short time, we all started to Elzy's house. At the school-house, Bun Easterwood and I left them and went to Coggins'. The other parties went on towards Elzy's house. Defendant Hamblin was clean shaved except a mustache."

On cross-examination this witness stated, that "Elzy Easterwood came to where defendant, Tom Carruth, Lem Jeffries, Bun Easterwood, Jinks Clark, and I were standing, near the front of the saloon. He came straight from the hotel to where we were standing. I saw him step off of the hotel porch and come straight to us. Nobody came with him. The women folks had then left the hotel and gone home. Elzy Easterwood did not go up the west side of the street with anyone, and when opposite the saloon, turned and came over to where we were. He came straight to where we were." This witness further states, that Elzy Easterwood did not make a proposition for Bun Easterwood to stay with him that night. He also stated, that it was about a mile and a half from town to Coggins' by the road, and that about fifteen minutes after they got in their room at Coggins' they heard two pistol shots in the direction of town. This witness testified, that Sam Hamblin had no chin beard that night, and that Bun Easterwood was not drunk, but was drinking.

W. H. Kendrix testified substantially as did his wife, Mrs. W. H. Kendrix, as to occurrences up to the time the parties reached Elzy Easterwood's house after the ball. He thinks they were at Easterwood's ten or fifteen minutes before Easterwood came. Just before that he heard a noise out by the porch, as if some one was vomiting. Just afterwards Easterwood came in. Heard no one talking

outside the house, either before or after he came in. A short time after he came in, Barbee and witness went out of the house for a purpose; no one had called either out. After they got out the house, saw Sam Hamblin outside the fence, to the north side, near the gate. Nobody was with him. Witness then tells about the trip made by himself, Hamblin, and Barbee, and upon their return to Easterwood's, Hamblin said he was going to bed. There was no one with him when he went off to bed. Does not know how long after the shots were fired before he went to bed. He does not know how long they had been at Easterwood's house before these shots were fired; may have been an hour. This witness says: "I can't say positively whether the shots were fired before or after Elzy Easterwood came home, but my best recollection is, that they were fired after we had been to Dodson's and gone back into the house. Think they were fired just before or just after we went to Dodson's with Hamblin."

Mrs. Bill Barbee testified substantially as did the others, on her examination in chief. She states, that Elzy Easterwood came to his house five or ten minutes after the other parties had reached there. That it was about an hour and a half after the ball broke up till the two shots were fired. That Elzy Easterwood had gone to bed when the two shots were fired. That Tom Carruth and Lem Jeffries were not at Easterwood's house when the two shots were fired; they had gone. She states she heard no vomiting outside after she reached Easterwood's house. Heard no talking, and no one called to Barbee or Kendrix to come out of the house. Nor did she know that they had been to Dodson's until they returned and said they had been there with Sam Hamblin.

K. K. Leggett, Mr. Peden, Tom Eddings, W. C. Lambeth, Ed. S. Hughes, and Mr. Shropshire testified with regard to the distance which pistol shots might be heard, they testifying, that they had heard the pistol shots at distances ranging from four-fifths of a mile to four miles.

Mrs. Elzy Easterwood testified substantially as did the others, up to the time they reached her house after the ball. That it was about ten minutes after her husband left them to go to the saloon to see about Bun Easterwood when he came into the house at home. She says Barbee and Kendrix were gone from the house about ten minutes, when they returned and said they had been to Dodson's with Sam Hamblin. That she went to the door and saw Sam Hamblin go into his house. She does not remember whether Lem Jeffries went with him or not, but he left the house about the same time. That about an hour and a half after they got home, and were fixing to go to bed, she heard two pistol shots. That at that time Elzy Easterwood, her husband, was in bed. "I did not know that Sam Hamblin was at our place until the parties (Barbee and Kendrix) came back and said they had been to Dodson's. As they came back from Dodson's I opened the door, and as I did so Jeffries stepped out. It was an hour and a half after Hamblin left the house and started to his house before I heard the

shots. The shots were heard distinctly. The moon was shining that night as we went home. My husband did not leave the house that night after he went to bed."

George Bagget, recalled, stated, that after he had been to the saloon and got Boyett to his barber shop, Lem Jeffries brought a pistol to him (witness), saying it was Boyett's pistol; that Sam Hamblin sent it to him.

E. R. Boyett testified, that he clean shaved Hamblin, except his mustache, about 6 o'clock on the evening of the ball. That Hamblin, seeing witness' pistol in the shop, carried it off with him. That the pistol was a 41-caliber Colt. That from fifteen to thirty minutes after the ball broke up Lem Jeffries brought the pistol to the barber shop and gave it to him. "I was not drunk that night, but think all the rest were. I might have been taking care of Bagget, or Bagget might have been taking care of me."

. B. A. Cox testified, that he is an attorney at law. On the morning after Baker was shot, he examined the clothing of defendant and also of Elzy Easterwood, and saw no blood on the clothing of either. That he had stepped the distance from Corrigan's Hotel to Easterwood's, and made it 734 yards. Had also stepped it from the hotel to George Hunter's, and that was 750 yards.

Charles Kennon testified, that he was clerking in Warren's store. Went to the store with Bob Martin and Grant Harris after the ball, to get some canned goods for them. Grant Harris remained in the store perhaps ten minutes after Martin left. Heard no shots while Martin and Harris were at the store.

A. Neff testified, that he went to bed in the Corrigan Hotel, and heard the shots about an hour and a half after the ball broke up. Had been in bed about forty minutes when the shots were fired. He only fixed the time approximately. He said, that in ten or fifteen minutes thereafter Baker was brought into the hotel, and Dr. Hensley had just come into the office when witness went down.

Mrs. Boaz testified, that she was the mother of Mrs. Kendrix. Staid all night at the Corrigan Hotel that night. Her room was on the ground floor. Saw several parties passing down the street from her window—three or four. In a few minutes after the parties passed, heard two shots near the hotel. Heard the first shot, and then heard some one say, "I will shoot him again, if you say so." Heard no reply, but then heard the second shot. Did not know the parties who passed the window. Baker was brought into the hotel in about five minutes, perhaps longer, after the shots were fired. Next morning about 6 o'clock she heard John Baker make a statement to Judge Jernigan, who was writing Baker's statement down. She was not in the room where Baker and Jernigan were. Looking and listening through a crack, she heard Baker say twice to Judge Jernigan, that "Will McMillan shot me." Did not hear any one interfere and say, that was not in accord with previous statements made by him.

J. H. Thornton testified, that the ball broke up at twenty-five minutes past 11 by railroad time. That he looked at his watch, and he had correct railroad time.

Mrs. Sam Hamblin testified, that she was the wife of the defendant. That her husband had owned no pistol for two years previous to the night of the ball. That she staid at Dr. Dodson's that night. The last she saw of her husband was about dark. He was clean shaved and had on a cap that night.

Will Crozart testified, that he remembered seeing Bagget and Boyett at Cravens' corner that night.

In rebuttal, Captain Buel testified, that he was observer for the signal service at Abilene, on December 26, 1892. The wind was from the north, and between 11 and 12 o'clock was blowing about three miles per hour. What is known as railroad time, is the time of the 90th meridian. The 100th meridian passes through the western edge of Taylor County. There is a difference of four minutes to the degree, which makes railroad time about forty minutes faster at Merkel than actual or sun time. New Orleans is on or near the 90th meridian, and on the night of the 26th of December, 1892, the moon set there about 12 o'clock at night, 90th meridian time, which would make it set at Merkel about 12:40, railroad time. The usual velocity of the wind in this country is from fifteen to twenty miles per hour—oftener forty. Three miles per hour is considered a calm.

James W. Brooks testified, that he had to-day shown Mr. Frier the impressions made upon his counter by jabbing the muzzle down on the counter on the night of the 26th of December.

J. C. Frier testified, that he had examined and measured the impressions made upon Brooks' counter. That they were made by a Colt's pistol that shoots a 38 Winchester bullet. The impressions were not made by a Colt's 41-caliber pistol. The 38-caliber Winchester cartridge is about the size of the Colt's pistol, which shoots a 44-caliber pistol cartridge.

Judge Jernigan testified, that he took down the statement of John Baker the next morning after he was shot. This witness says: "When I had finished it, I had the name of Will McMillan in two places, where he spoke of who went to the saloon with him, and who it was that commenced to curse and abuse him while at the saloon. When I read the statement over to him, and reached the name of McMillan, he stopped me, and said, 'O, no; that's not right. It was Sam Hamblin, and not McMillan;' and I erased McMillan's name and inserted Hamblin's, and that is how it come to be erased in the written statement. [The witness here identified the statement made to him by Baker at the time he testified about, and same was offered in evidence by the State.] The only statement that Baker made to me that night or morning was the one I reduced to writing, and is all the statement made by Baker to me that night or morning. I reduced it all to writing."

It is unnecessary to reproduce this statement, as it is fully explained by Judge Jernigan with regard to interlineations.

The State then introduced an almanac to show that the moon went down at New Orleans at 12 o'clock.

The facts with regard to the proposed rejected testimony offered by the defense to impeach the statement and testimony of the deceased, John Baker, are sufficiently stated in the opinion of the court.

*Cockrell & Cockrell*, for appellant, filed a most able argument on the facts, to show that the defense had fully established an alibi in the case, and the failure of identity as to the parties committing the deed. [The Reporter regrets that owing to a lack of space he can not reproduce their argument in full.]

As to error of the court in excluding their proffered evidence impeaching the statement and evidence of Baker at the examining trial, they cited Felder v. The State, 23 Texas Crim. App., 477; Morelock v. The State, 18 S. W. Rep., 258; Steel v. The State, 7 S. W. Rep., 40; Patterson v. Deshone, 20 Atl. Rep., 538; Wallace v. The State (Texas Crim. App.), 24 S. W. Rep., 99.

No brief for the State has come to the hands of the Reporter.

DAVIDSON, JUDGE.—Appellant was given a life sentence under a conviction of murder in the first degree. During the trial he offered to prove by "Mrs. James Baker and L. I. Easterwood, that on Saturday, December 31, 1892, and after the examining trial before G. W. Jernigan, in which defendants were tried for assault with intent to murder John Baker, and after said John Baker had testified in said examining trial, he, the said John Baker, in the presence of Mrs. James Baker and L. I. Easterwood, accused the said L. I. Easterwood of being one of the two parties present when the assault was made on him which resulted subsequently in his death; and defendant further offered to prove by L. I. Easterwood and E. P. Boyett, that after said examining trial, and on the night before said John Baker died, he, the said John Baker, stated to the said witnesses that he, the said Baker, was not certain that Elzy Easterwood was one of the parties who committed the assault on him, the said Baker, and which assault subsequently resulted in his death. * * * It was expressly stated by counsel for defendant at the time, that the declarations were not offered as dying declarations." This was objected to by the State's counsel, because not made as dying declarations, because no proper predicate had been laid, and the statement was hearsay. This evidence was not objectionable as hearsay. 1 Phil. Ev., 177, 318. As set forth in the bill, the evidence should have been admitted. The State having introduced the evidence of the deceased witness, it was not necessary for appellant to lay the usual predicate for the introduction of impeaching testimony. It was impossible to do so. Upon this question the de-

cisions may be divided, but it would seem to us that justice would demand that such evidence should be admitted where the State introduces the evidence of a deceased witness. The rule that it is unfair to attack the credit of such a witness without affording an opportunity to explain should be subordinated to the rights of the accused, whose life is sought, as well as the higher interests of society. The law which is seeking the life and liberty of the citizen for an alleged infraction of its provisions has thrown around that citizen the presumption of innocence, and the reasonable doubt of guilt, under the evidence; and it would be a harsh rule, indeed, to admit the evidence of a witness given on another trial, and make this evidence absolutely true by eliminating all opportunity of discrediting it. This would seem to obliterate the hope of eliciting the truthfulness of such testimony, and leave the accused at the mercy of the evidence of a witness who may have admitted the falsity of his statements and his corrupt motives for so testifying. If the rule be a sound one that the evidence of a dead witness can be reproduced, then it should follow that his testimony could be attacked in any way that any other witness may be impeached. In his work on Evidence, Mr. Stephens says: "Whenever any declaration or statement made by a deceased person relevant, or deemed to be relevant, under articles 25–33, both inclusive, or any deposition, is proved, all matters may be proved in order to contradict it, or in order to impeach or confirm the credit of the person by whom it was made which might have been proved if that person had been called as a witness, and had denied upon cross-examination the truth of the matter suggested." Steph. Dig. Ev., p. 191, art. 135. See same work, article 32, and note 22 in appendix.

The writer is unable to perceive the distinction between impeachment of dying declarations, by proving contradictory statements, and thus attacking the reproduced testimony of the witness taken on an examining trial, whether the same reason would or would not operate to authorize the introduction of such dying declarations or examining trial evidence as original testimony. That dying declarations may thus be impeached is well settled, we think, and correctly so. For discussion of these questions, see Felder v. The State, 23 Texas Crim. App., 477; Morelock v. The State (Tenn.), 18 S. W. Rep., 258; Steele v. The State, 7 S. W. Rep., 40; Patterson v. Dushane (Pa. Sup.), 20 Atl. Rep., 538. The life and liberty of the citizen is worth more than the supposed fairness or unfairness of the treatment of a witness. To our minds the doctrine is too harsh for toleration, that the life of the accused may be taken on such evidence, and yet he be denied the right to impeach the veracity of the witness who gives such testimony. Such impeachment evidence, however, may be so weak or remote as not to require a reversal; or the evidence of guilt may be so strong and conclusive, independently of such testimony, as to render harmless the rejection of such impeachment. In such state of case it would not be required to reverse the judgment or grant a

new trial in the first instance. Such we believe to be the case before us. The evidence of guilt is so conclusive against appellant and Easterwood, that no jury seeking to do their duty would or ought to have honestly returned a verdict otherwise than of murder, if the proposed evidence had been received. If the proposed evidence had been admitted, it tended to raise a doubt only as to the presence of Elzy Easterwood at the homicide, but none as to appellant. The deceased's testimony taken at the examining trial, as well as his statements at the time and place of the shooting, are clear, strong, and unequivocal that appellant and Elzy Easterwood acted together in committing the homicide; and it may be admitted that the State's case hinged largely upon the fact that these two parties acted together in slaying deceased. If doubt could be thrown upon the presence of Easterwood at the homicide, it would tend to impair the strength of the State's case against appellant.

While we think the offered testimony was admissible, yet, in view of this record and cogency of the criminative evidence against appellant, its rejection is not of sufficient importance to require a reversal of this judgment. We are unable to see how any other conclusion could have been reached than that of guilt; that the killing was murder in the first degree—murder upon express malice. Nor is there reasonable doubt that appellant fired the fatal shot terminating the life of the deceased. We can not preceive from this record how a more favorable verdict could have been rendered by an honest jury. The evidence is clear and conclusive that the two parties acted together; that appellant shot deceased in the back, and Elzy Easterwood cut his neck several times, in an attempt to cut his throat, after he was shot down and helpless, and this, too, while the deceased was begging his kind offices and friendship. The killing was a cold-blooded and heartless one, and assassination solely for the purpose of destroying the testimony of deceased in a cattle-stealing case, coolly composed and boldly executed. The remaining questions are not of sufficient merit to require discussion.

Finding no errors of sufficient importance to require a reversal, the judgment is affirmed.

*Affirmed.*

HENDERSON, Judge, concurs in the conclusion reached, but expresses no opinion as to the admissibility of the proposed impeaching testimony in the absence of a predicate. In his opinion, the decision of said question is not necessary to a decision of this case. The admission or rejection of said testimony makes no difference in the result reached.