## WILLIAM LYLES v. THE STATE.

### No. 1450.  Decided January 17, 1912.

**1.—Murder—Continuance—Depositions.**

Where the application for continuance showed that it was the eighth application, and that one of the alleged absent witnesses had been out of the State for seven years, and the other was confined to her bed for an equal number of months, the defendant should have made some effort to get their depositions.

**2.—Same—Evidence—Dying Declarations—Impeachment.**

Where, upon trial of murder, the court refused to admit testimony to impeach the dying declarations of deceased, which strongly corroborated defendant's version of the homicide, there was reversible error; there being no showing that at the time the deceased made contradictory statements that he was under the influence of opiates, etc.

**3.—Same—Evidence—Conclusion of Witness.**

Where the witness had detailed all she saw and heard of the homicide at the time, it was not permissible to show what she would have done under certain circumstances.

**4.—Same—Charge of Court—Filing—Nunc Pro Tunc.**

Where the court gave additional instructions in writing, and his attention was called to the fact that this charge was not filed, and the court instructed the clerk to place the file mark thereon nunc pro tunc, before an appeal was perfected, there was no error.

**5.—Same—Evidence—Bill of Exceptions.**

Where no bill of exceptions was reserved to the introduction of testimony, the matter could not be considered on appeal; besides there was no error in admitting the dying declarations and the testimony surrounding it.

**6.—Same—Temporary Insanity—Intoxicating Liquor—Charge of Court.**

Where, upon trial of murder, the court properly instructed the jury that intoxication, or temporary insanity caused by the voluntary recent use of ardent spirits, will not constitute an excuse for the commission of crime, but may be considered in mitigation of the punishment to be assessed, there was no error.

**7.—Same—Requested Charges.**

Where the requested charges were covered by the main charge, there was no error.

**8.—Same—Evidence—Dying Declarations—Opinion of Witness.**

Where the proffered evidence in positive terms contradicted the dying declarations of the deceased introduced by the State, this was not an opinion of the witness, but a statement of facts and should have been admitted in evidence. Following Orange v. State, 47 Texas Crim. Rep., 337, and other cases.

Appeal from the Criminal District Court of Harris. Tried below before the Hon. C. W. Robinson.

Appeal from a conviction of murder in the second degree; penalty, · five years imprisonment in the penitentiary.

The opinion states the case.

*Brockman, Kahn & Williams,* for appellant.—On the question of contradicting dying declarations: . Connell v. State, 46 Texas Crim.

Rep., 259; Sims v. State, 36 Texas Crim. Rep., 154; Lockhart v. State, 53 Texas Crim. Rep., 589; Craft v. State, 57 Texas Crim. Rep., 257; Clark v. State, 56 Texas Crim. Rep., 293, 120 S. W. Rep., 179; Gaines v. State, 58 Texas Crim. Rep., 631, 127 S. W. Rep., 181; Roberts v. State, 5 Texas Crim. App., 141; Pierson v. State, 21 id., 14; Strickland v. State, 13 id., 364; Felder v. State, 23 id., 477; Hamlin v. State, 34 Texas Crim. Rep., 368; Herd v. State, 43 id., 575; Philips v. State, 50 id., 127; McCorquodale v. State, 54 id., 357.

*C. E. Lane,* Assistant Attorney-General, and *Richard G. Maury,* for the State.—On the question of contradicting dying declarations: Drake v. State, 29 Texas Crim. App., 265; Warren v. State, 9 id., 619; Williams v. State, 40 Texas Crim. Rep., 497; Medina v. State, 43 id., 52, and cases cited in opinion.

HARPER, Judge.—Appellant was convicted of murder in the second degree in the Criminal District Court of Harris County, Texas, and his punishment assessed at five years confinement in the penitentiary.

1. In the first ground of his motion for a new trial he complains of the action of the court in overruling his application for a continuance. This application was the eighth application filed by appellant, and there was no error in overruling same, as it appears from the record that one of the witnesses had been absent from the State since 1904, and the other had been confined to her bed with paralysis for a number of months, and would never again be able to attend court. Had the appellant desired the testimony of these two witnesses, one of them having been absent from the State for seven years, and the other confined to her bed for an equal number of months, he should have made some effort to get their depositions.

2. In three of his bills of exception appellant complains of the refusal of the court to admit certain testimony, for the purpose of impeaching a dying declaration admitted in evidence. One of the bills reads: "Be it remembered that upon the trial of the above entitled and numbered cause, in which defendant was convicted of murder in the second degree upon his plea of 'not guilty' and was sentenced to five years in the State penitentiary, and upon which trial defendant, himself, testified that the homicide was accidental and was caused by his stumbling, which caused his gun to accidentally discharge; that he was friendly with deceased and had no intention of injuring deceased or shooting at him. The State offered in evidence and over objection of defendant the following dying declaration of deceased and it was introduced as evidence for the State and same went to the jury, said dying declaration being as follows, to wit: 'I live this side of Hall's Bayou; I was going home Monday, November 23, about five o'clock. Mr. George Dupree was going home,

too.   Mr. Lyles and Mr. John Stone was in Mr. Dupree's wagon.
Mr. Lyles finally got out of Mr. Dupree's wagon and got in mine.   I
had to pass Mr. Lyles' house going home.   When we got to Mr.
Lyles's house he got out and fed his horse and chickens and went
into the house and got his gun and some cartridges; he had them in
his hand when he came out; he loaded his gun and got in my wagon
and we drove to Mr. Snyder's house.   When we got there we both
got out and had two drinks of wine with Mr. Snyder; we then got
in the wagon and drove as far as Mr. Bunk Dupree's.   When we
stopped, Mr. Dupree and Miss Sally Roberts was cutting wood; Mr.
Lyles told them to stop; they did not stop, and he then raised his
gun and shot at them.   He shot twice; he then loaded his gun.   I
jumped out of the wagon and hollered at him not to shoot; he turned
on me and said, "You God-damned son-of-a-bitch, I will shoot you."
He then shot at me, shooting me in the hip.   I fell and drug myself
away in the bushes.   When we got to Dupree's and just before Mr.
Lyles shot at Mr. Dupree, I told Mr. Lyles Mr. Dupree was cutting
wood for Mr. George Loempke.   He said he did not give a damn,
they could not cut wood there.   Signed William Leben (His mark).' "

In the first bill he alleges that he expected to prove and could have
proven by Dave Echols that within two or three hours after the shoot-
ing he saw deceased Leben and had a conversation with him in ref-
erence to the shooting, and that deceased at that time said that de-
fendant did not shoot him intentionally, and that it was an accident.
In his second bill defendant states he expected to prove and could
have proven by the witness J. M. Ludke that the witness had a con-
versation with deceased Leben three or four days after the shooting
(and about three days before his death) and that deceased had stated
to him that he and defendant were warm friends, and had had no
controversy of any kind on the occasion of the shooting, and that,
in his opinion, defendant did not intend to shoot him, and that the
shooting was accidental.   That he and defendant were both drinking,
and that defendant staggered back and stumbled over something, at
which time the gun was discharged.   In his third bill defendant states
he offered to prove and could have proven by the witness Mrs. Alice
Pilcher that she visited deceased before his death, and "that she asked
him what in the world could have caused it, as she understood that
he and defendant were the best friends, and that Leben replied that
defendant did not shoot on purpose, that it was only an accident;
that they were drinking and fooling with the gun and that it went off
and shot him.   That she then asked deceased if he knew that a com-
plaint had been made against the defendant and that he had been put
in jail for shooting him, and he replied that he had heard that that
was a fact, and added that he expected to get well, and that though
it would be a long time before he could get about except with a
crutch, but that as soon as he was able to get up to the court he
would have defendant liberated."

This testimony would all have tended to strongly corroborate defendant's version of the shooting. The declaration of deceased, introduced as his dying statement, would make a case of wilful and intentional homicide against this defendant. If the deceased had been living at the time of the trial, and had so testified, there is no question but by laying the proper predicate, the testimony of all three of these witnesses would have been admissible as having a tendency to impeach his testimony, and under what rule of law they should be excluded now we fail to see. In the case of Felder v. State, 23 Texas Crim. App., 488, this court held: "Dying declarations derive their admissibility as evidence from the necessity of the case. They are generally made to friends of the deceased, and under circumstances where the physical conditions and surroundings of the declarant are such that cross-examination is unattainable. Made under a sense of nearly impending death, the awful solemnity of the occasion stamps them with the verity which attends statements made under the sanction of an oath. But the allowance of them is a jealously guarded concession to the ends of human justice. That this is so is evidenced by the requirements as to predicate for their introduction, and also by the limitation upon their admissibility to the identity of the perpetrator and the circumstances of the crime. The oath may be dispensed with; but no circumstances of extremity can compensate the want of a cross-examination. They are themselves hearsay testimony, and, as has been said, their admissibility springs out of the necessity of the case. But, after admitting them, it would be a perversion of all right reasoning to deny to an accused a like relaxation of the rule, the occasion for it being produced by a coincident and coextensive necessity. If the State may invoke a departure from the ordinary rules of evidence, upon the ground of necessity, would it not be a hardship to deny the same to the accused, when the necessity has been put upon him by the concession made to the State?

" 'Statements made by the defendant,' says Mr. Bishop, 'contradictory of dying declarations, and contradictions in the latter, may be shown to detract from their weight with the jury.' (1 Bishop Crim. Proc., 1209.) The same doctrine is asserted in a long line of adjudicated cases. (McPherson v. The State, 9 Yerg, 279; Moore v. The State, 12 Ala., 764; People v. Lawrence, 21 Cal., 368.)

"In delivering the opinion in the latter case, Field, C. J., said: 'The rule is general that the credit of a witness may be impeached by proof that he made statements contrary to what he has testified. There is, it is true, a condition to the rule, with reference to verbal statements, that the attention of the witness must be previously called to the particular occasion and circumstances under which the supposed contradictory statements were made, in order to give him an opportunity of making any explanation of the matter which he may have. But this preliminary condition, it is clear, can not be complied with when dying declarations are offered in evidence, except in very rare

cases.  Such declarations are generally made to the physician or
friends of the deceased, in the absence of the party against whom they
are offered, who, of course, has no opportunity of cross-examination,
or of directing the attention of the deceased to any alleged contra-
dictory statements made by him. . . .    There would be no justice,
therefore, in any rule which would deprive the accused of the right to
impeach the credit of the deceased by proof of his having made con-
tradictory statements as to the homicide and its cause.' "    See also
Hamlin v. State, 34 Texas Crim. Rep., 368, and authorities there
cited; Branch's Crim. Law, sec. 490, for Texas authorities; Morelock
v. State, 90 Tenn., 528; Carver v. United States, 164 U. S., 694;
Shell v. State, 88 Ala., 14; Stevenson v. United States, 86 Fed., 111;
State v. O'Shear, 60 Kan., 780; Gregory v. State, 140 Ala., 16; Peo-
ple v. Lawrence, 21 Cal., 368; State v. Lodge, 9 Houst. (Del.), 542;
Lester v. State, 37 Fla., 382; Battle v. State, 74 Ga., 101; Dunn v.
People, 172 Ill., 582; Green v. State, 154 Ind., 655; State v. Charles,
111 La., 933; Com. v. Cooper, 5 Allen (Mass.), 495; Nelms v. State,
13 Sm. & M. (Miss.), 500; State v. Shaffer, 23 Oreg., 555.

Of course, if the objection was made that deceased was not sane
at the time or was under the influence of opiates, or other reason why
he did not know or understand what he was saying, it would be in-
cumbent upon the defendant to show that deceased at the time was
in a frame of mind to talk intelligently, but these objections are not
raised on the objection that the testimony is hearsay, and the court
erred under the record in this case in not admitting this testimony.

3.  In the examination of the witness Mrs. Sallie Dupree, the
defendant asked her: "If you had then thought that he (defendant)
intended to shoot you, you would not have stayed there and waited
for anything further?" to which the witness answered, "No, sir."
On motion of the State this testimony was excluded.  In this there
was no error.  The witness had detailed all she saw and heard at the
time, and it was not permissible to prove what she would have done
under other circumstances, or if the circumstances indicated this
or the other conclusion to her mind.

4.  Appellant in bill No. 5 states that after the jury had retired,
they returned into court and asked additional instructions, when the
court, in obedience to said request, gave them further instructions in
writing, the complaint being that this additional charge had no file
marks thereon, although signed by the judge.  When the attention
of the court was called to this matter he instructed the clerk to place
the file marks thereon nunc pro tunc.  The failure of the clerk to
place the file marks thereon would not be cause for reversal, when the
correct file marks are placed thereon before an appeal is perfected.
Nettles v. State, 4 Texas Crim. App., 337; Hill v. State, 4 Texas
Crim. App., 557; Lowe v. State, 11 Texas Crim. App., 253; Ken-
nedy v. State, 9 Texas Crim. App., 399.

5.  This disposes of all the bills of exception in 'the record, but in the motion for a new trial appellant complains of several paragraphs of the court's charge, and failure to give special charges requested. The grounds in the motion complaining of the admissibility of certain testimony, to which no bills of exception were reserved, or at least do not appear in the record, can not be considered by us. However, a number of them relate to matters in which the State was having detailed the condition of deceased, his frame of mind, and whether or not he was aware that his death was only a question of time, at the time of making the statement introduced as his dying declaration. When the appellant contested the right of the State to introduce the dying declaration, he can not be heard to complain that in showing the deceased was sane, and was conscious of approaching death, his physical and mental condition are described by the witnesses, and his expressions stated in regard to his knowledge that death must ensue. These matters, though presented in the motion for a new trial, are not verified by any bill of exceptions, and in so far as this record discloses, the court did not err in admitting the dying declaration, or the evidence in regard thereto.

The court charged the jury on murder in the second degree, assault to murder, and aggravated assault, also instructing them that if the shooting was acidental, or the gun was unintentionally discharged, defendant should be acquitted, or if they had a reasonable doubt as to whether this might not be true, they would acquit him. Every issue in the case was submitted in the court's charge, and the court correctly instructed the jury that intoxication or temporary insanity caused by the voluntary recent use of ardent spirits will constitute no excuse for the commission of crime, nor shall intoxication mitigate the degree of crime, but evidence of temporary insanity produced by the use of ardent spirits may be introduced in evidence in mitigation of the punishment to be assessed. This was called for under the evidence, and the court did not err in instructing the jury that same might be considered in determining the punishment, but could not be considered in determining whether or not the defendant was guilty of murder in the second degree, assault to murder, or aggravated assault. (Hernandez v. State, 32 Texas Crim. Rep., 271; Clore v. State, 26 Texas Crim. App., 624.) While temporary insanity produced by the recent use of intoxicating liquors may be considered in passing on whether one is guilty of murder in the first or second degree, yet it can not be considered in fixing the grade of offense in any other instance. The special charges requested, in so far as applicable to this case, were covered by the main charge, but on account of the errors above pointed out herein the case is reversed.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

HARPER, JUDGE.—This case was reversed and remanded at a .former day of this term, and the State has filed a motion for a rehearing alleging that the court was in error in holding that the evidence of the witnesses named ought to have been admitted, tending to impeach the dying declarations. We are referred to the case of Tomerlin v. The State, 26 S. W. Rep., 676. This case has no application to the case under discussion. The evidence was not offered to impeach any declaration already introduced in evidence, but was offered as original evidence, and the court correctly held that the evidence was inadmissible, as it was not offered as a dying declaration, and no facts or circumstances were introduced in evidence which rendered it admissible. In this case if the State had not introduced the dying declarations, the evidence of the witnesses would have been inadmissible, but when the State introduced the dying declarations, then the contradictory statements became admissible in evidence. We are next referred to the case of McCorquodale v. The State, 54 Texas Crim. Rep., 357. In this case the rule is stated: "Where dying declarations are admissible in evidence other statements of deceased contradictory of the dying declarations are usually admissible, that is, if they tend to impeach or contradict or depreciate the value of the dying declarations." This is the rule announced in the original opinion in this case, and why the evidence of the witnesses was admissible. The evidence offered contradicted and tended to impeach the dying declarations. While in the McCorquodale case the evidence was held not to contradict the dying declarations, in this case no such contention can be made. · The dying declarations state: "Defendant told them to stop; they did not stop; he raised his gun and shot at them. He shot twice and he then loaded his gun; ·I jumped out of the wagon and hollered at him not to shoot, when he (defendant) turned on me and said: 'You God damned son-of-a-bitch, I will shoot you.' " This is all the evidence the State offered to show malice. The witness Ludtke would have testified as shown by the bill: "The defendant proposed to prove by the witness J. M. Ludtke that he had a conversation with deceased about three or four days after the shooting of the deceased by defendant, and that deceased stated to him that he and the defendant were the warmest of friends, and had never had a particle of hard feeling between them; that they had had no controversy of any kind on the occasion of the shooting, and that, in his opinion, the defendant didn't intend to shoot him at the time he did so, but that the shooting was purely accidental on the part of the defendant. That he and the defendant were both drinking, and that the defendant staggered back and stumbled over something, at which time the gun was discharged, in the opinion of the witness, accidentally, and the deceased was shot."

This in positive terms contradicted the dying declarations, was very material testimony, and if true, supported the testimony of defendant, and under it he could not be convicted of murder. It is not the opinion of a witness, but a positive statement of facts, and under the authorities cited by the State, as well as appellant, was admissible. But see in addition to the authorities cited in the original opinion: Orange v. State, 47 Texas Crim. Rep., 337; Phillips v. State, 50 Texas Crim. Rep., 127; Strickland v. State, 13 Texas Crim. App., 364; Hamlin v. State, 34 Texas Crim. Rep., 368; Herd v. State, 43 Texas Crim. Rep., 575.

Motion for rehearing is overruled.

*Overruled.*